Case number 18-6194 Cigar Association of America v. Federal Assembly President, United States, U.S. Administration District Attorney, Federal Assembly Chief of Staff, Virginia Police Thank you, Chief Judge Garland. I'd like to reserve three minutes for rebuttal. The FDA warnings must cover 30% of the two main sides of every cigar and pipe tobacco box and 20% of every cigar and pipe tobacco advertisement. They come in a stark black-on-white format that makes the government the most prominent speaker on each medium. The law has developed to make clear that these warnings violate the First Amendment. The Supreme Court's decision in the National Institute of Family Life Institutes v. Becerra in June of 2019 held that compelled commercial disclosures must first remedy a problem that is real and not purely hypothetical and, two, must extend no broader than is reasonably necessary. And the burden is on the government to so prove. Doesn't this, for all of the long wind-up about Central Hudson and Zotter and everything else, doesn't this case just come down to the government's selection of an area, 30%, as opposed to a smaller warning that you concede would be permissible? Yes, Your Honor. This case, this part of the Cigar Association case is about the size of the warnings, not their content. The content is being challenged below, but in this posture, the only issue is the size. If that's all that's at issue, doesn't the government get a certain amount of leeway in saying 30 as opposed to 25, as opposed to 20, as opposed to whatever? The government has some discretion in this area, but it also has a constitutional burden to satisfy, and that burden is to show that the warnings extend no broader than is reasonably necessary. I mean, I understand that, but I mean, I'm thinking of Burson v. Freeman, which is a First Amendment case applying strict scrutiny, and the question was within how many feet of a polling area can a certain restriction be imposed? And the Supreme Court said, if you're just picking that number, the government has a lot of latitude, and we're not going to sort of apply strict scrutiny to the question of 30 versus 29. Well, Your Honor, I think in this particular case, we have a different situation, because for the last 18 years, there has been a warning scheme in place for cigars imposed by the Federal Trade Commission. That scheme covers somewhere between 10 and 14 percent of one panel of each cigar box and 4 to 8 percent of every cigar advertisement. It covers today more than 80 percent of the industry. At the time that the FTC warnings were promulgated, it covered 95 percent of the cigars sold in the United States, and the agency did not properly deal with shifting from that widespread system to this broader warning. In those circumstances, we think that the burden is on the government to show that that less restrictive alternative would be adequate to serve the government's interest, whatever that interest may be. We can talk about that in a moment. I mean, if it's a unitary choice between the old FTC regime, 4 to 8 percent, or the current regime, 30 percent, your argument has a lot of force. I mean, this is a much greater speech burden than the prior regime. But if it's just that they have, let's assume the agency has good reason for wanting to expand the size of the warning, and then, back to my first question, at that point are we just back to they're picking a number and we're on a spectrum, and how is anyone going to assess whether 30 is the right balance as opposed to 29? Well, I do agree with Your Honor that it would be a different case if the agency were choosing the scope and size of the cigar warnings for the first time, if there were not an existing regime that was available for study. But that's not this case. Here we had a scheme that was in place for most of the industry that most of the industry already complies with, for which there would be no conversion costs for most of the industry, and the agency said that we need to go in a different direction and expand these warnings to cover 30 percent. And Congress, in the family prevention statute, made findings and stated a purpose. One of the findings was that the FDA has the expertise to evaluate the impact of labels on consumer behavior, and the purpose section of the statute says because of that expertise, we're giving the FDA the primary regulatory authority. I understand your argument to be that the FDA never exercised that expertise to evaluate labels and their effect on consumer behavior. That's exactly right, Your Honor. As the discourse decision in R.J. Reynolds v. the Food and Drug Administration pointed out, the principal focus of the Family Smoking Prevention and Tobacco Control Act was on how labels would reduce the use of tobacco. As a result, this Court identified that as the key purpose, and the opinion moored that right in the statute, citing that very finding, that when Congress was channeling that expertise through the agency, it was focused on its ability to look directly at how these labels would reduce tobacco use, and that didn't happen there. There was an argument in R.J. Reynolds' fallback position that said, well, the government interest, the purpose here is just to inform consumers. That was rejected. That's just the means. The objective was, and the interest of the government, was reducing the use of tobacco. In that case, cigarettes. That portion of R.J. Reynolds, I take it your argument is, was never overruled by American meat. That's still circuit law. Absolutely not. It was not overruled, and you're exactly right, Your Honor. The R.J. Reynolds Court noted that the agency wasn't leaning on that issue hard, but also rejected the interest in effectively communicating the health risks of cigarettes in that case as a freestanding substantial interest that can justify a compulsion of speech. Can I ask you about that? Yes, Your Honor. So that's from a part of R.J. Reynolds which declined to apply Zauderer and instead applied Stenthal-Hudson, right? Yes, Your Honor. And you don't have any dispute that Zauderer, as interpreted by the Supreme Court's most recent opinion, is the one that governs this part of the rule, correct? Well, we do contend that insofar as the warnings were expanded from 10% to 14% to 30% on packages. That's not – I understood that was part of your claim of the undue burden, which is part of the Supreme Court's explanation of what Zauderer requires and what we previously said Zauderer also applies. There's no suggestion that Stenthal-Hudson applies to this kind of warning, is there? We do contend that the expansion of the warnings has a restrictive effect on our speech and that quantum needs to be decided. It's the position, as I understand it, no matter whether you apply Stenthal-Hudson or you apply Beccara or you apply Zauderer, you still have to identify what the government interest is. And you can't do that – you can't apply Beccara and determine whether something is reasonably necessary unless you find out what it's necessary to accomplish. So it doesn't matter one way or the other whether you apply Zauderer or Stenthal-Hudson. If any decision of our court said that under Zauderer, the interest of the government in ensuring that consumers know whether a product will harm them is insufficient for Zauderer. Not whether providing that information will make them stop. Simply the interest in making sure that they know that it will harm them. Yes, I'll turn to your question and then to Judge Randolph's question. This court in American Meat held open the question of whether Zauderer requires a substantial state interest, the type of interest that would qualify under Stenthal-Hudson. Right, but the interest that was in American Meat is not different than the interest here. The interest there was providing consumers with information about where they got it. There was a suggestion that it might cause people to buy more American Meat, but there was no evidence in the record at all on that subject, as Judge Randolph pointed out in a subsequent opinion, National Association of Manufacturers. So the en bas position of this court is that you don't have to show, you don't have to have as the purpose, stopping smoking. Is your allegation that you have to have the purpose, stopping smoking? Yes, it is. Okay, so if that's the case, then your position is no warnings are permissible. Not just the large warnings, but no warnings. No, that's not our position at all, Your Honor. We think a case absolutely could be made for a warning scheme that would have the effect of reducing smoking cases. It's just not the case that was made by the agency here. A small warning would be effective in reducing smoking, but not a large one? It is quite possible that the agency could build a case that a warning of some sort was needed to reduce smoking rates, but that case wasn't built here. Again, the agency made the strategic decision not to build a case that this warning scheme would reduce the use of cigars. It disclaimed that interest. If you could assume for the moment, contrary to your view, but assume for purposes of the argument, that it is a permissible purpose for the government under Zauber, substantial enough, whatever that means, to provide information to the consumers about the dangers of the hazardous product. If that alone is sufficient. Now, the government cites evidence that since 2001, notwithstanding the warnings of FTC size, that people still don't understand the dangers of cigar smoking. Is that right? No, I don't believe that is right, Your Honor. That is what the agency argues in its brief before this Court, but I do not think that there is evidence in the administrative record of that. And in that regard, the agency claims that consumers misperceived the risks of cigar use, but they relied on data entirely collected in the 1990s before the Federal Trade Commission. Well, you submitted the PATH study, didn't you? We did, Your Honor. And the PATH study is after 2001, right? Certain waves of the PATH study are after 2001, yes. And the supplemental table B shows that substantially more than 50% of cigar smokers think that cigars might be less harmful than cigarettes. I will say that that is not a study on which the agency relied. But it is one you pushed in the district court, right? It is one. Do you want to renounce the study? Isn't that true? I mean, that is not a misconception, that smoking cigars is less risky than smoking cigarettes because of the way cigars are used and the number of, you know, there is some evidence that premium cigars are only smoked 1.7 times a month. So that is true, isn't it? That is absolutely right, Your Honor. If you look at the way cigars are used by most people who use them, in particular premium cigars, and Your Honor was right to point out that the PATH study demonstrates that the median premium cigar consumer uses the product 1.7 days per month, that that pattern of usage clearly is less dangerous than the normal pattern of usage of cigarettes, which is 29 days per month. Now leave aside this dispute about premium cigars. You agree, and maybe I am confused, I understood that you agreed that the warning labels are true and accurate. Is that correct? We are leaving this out of the size. You are not disputing the truth of the warning labels. At this stage of the litigation, the parties are not disputing the truth of the warning labels. They are being disputed below in their application process. But as far as we are concerned today, they are true, correct? Yes. Warning label three, cigars are not a safe alternative to cigarettes, correct? That's what it says? Yes, that is what it says. All right. So if people still believe, since 2001 and notwithstanding the FTC warning label, that cigars are a safe alternative to cigarettes, that suggests that the warning label hasn't done its job. Respectfully, we believe that the agency hasn't built a record for that. I'm just looking at your submission, Supplemental Table B, PATH Study. I'll be happy to leave out the premium cigars. Non-premium cigars, 27.1% smokers of non-premium cigars said they might be less harmful than cigarettes. 24.5% of cigarillo smokers and 27.7% of filtered cigar smokers all think the opposite of what you are conceding is true for purposes of this appellate argument. Your Honor, that is precisely why this rule needs to be remanded back to the agency, because this is a study which the agency did not undertake. I don't think you're answering Judge Garland's question. To say that cigars are a safe alternative to cigarettes is not the same thing as saying cigars are less risky than cigarettes. Cigars are dangerous, right? The question that Judge Garland is posing, are they just as dangerous  as smoking cigarettes? And the answer to that, where's the evidence that they're just as dangerous? I don't see any evidence to that effect. Your Honor, you're correct that warning number three does not match the data that Judge Garland is citing. They're going after two separate propositions, and nor does the data on which the agency relies, because again, the agency did not study misperceptions of cigars before the FTC warnings and after. All the evidence on which it relies is before. The afterwards evidence shows something quite different. For example, at page 535 and 537 of the jury appendix, one of the major studies, a study of college students showed that 93% of college students did not think that smoking cigars was less dangerous than smoking cigarettes. So again, this is the inquiry that the agency failed to undertake. At page 29066 of the final rule, it dealt with the format of the Federal Trade Commission warnings in less than a sentence, and it should have engaged in a differential study. Doesn't this part of your argument put at risk all sorts of health and safety warnings? Your position on the government interest point is that a warning is unconstitutional, except to the extent the government can prove that it is effective in changing consumer behavior. That seems like a pretty revolutionary proposition. Respectfully, Your Honor, I don't think it does put at risk most health and safety warnings. Why? This is a particular situation where we have had warnings in place for quite some time, and we're looking to change the scope and size of those warnings. We're saying in those circumstances, as in the R.J. Reynolds case, the substantial interest that needs to be driven is reducing tobacco use. Also, it's more than the statute, as the R.J. Reynolds opinion pointed out and as Your Honor pointed out. The agency, time and time again, asked the agency to exercise its expertise about how labels would reduce tobacco use. Section 906D1 of the statute required the agency to take into account how restriction on marketing would reduce tobacco use. What about a perfectly humdrum nutrition label? The government is indifferent about how much, I don't know, red meat or such someone is consuming, but they just want consumers to know that it has X percent fat and Y calories and whatever. Well, with respect, we think that nutritional labels and drug labels, which the government points to in their brief, are a very different case. First of all, they're much less intrusive than these. No, no, but just focus on the government interest. Is it a sufficient interest to convey fully accurate, non-ideological information within the meaning of Zotterer, or does the government have to defend the further interest of changing behavior as a result of the warning? Your Honor, we do not believe it is sufficient that the government has a purely informational interest that can drive the constitutional law. That puts at risk all of these other warnings. Well, it also puts at risk any meaningful limits on the government's ability to compel speech, Well, maybe we take care of that problem in the undue burden analysis. You're right, Your Honor, and I'm encouraging that as well, because, again, as Becerra tells us, and Becerra, the second part of Becerra, was all about the size and scope of the warnings. Becerra tells us that they can be no broader than reasonably necessary, and the ensuing analysis of the American beverage court in the Ninth Circuit was, you know, are these things too big? Will a lesser disclaimer or a smaller disclaimer suffice? And the government needs to prove that it doesn't. For every slippery slope, there's usually an opposing slippery slope, and the opposing slippery slope here is that if you allow the government to mandate disclosures for the purpose of educating consumers, then why not require, then it would be constitutional for the government to require that every cigar box contain a label showing where the particular strain of tobacco was raised and harvested, and what the strain is, and where it was rolled, and where it was packaged, and how long that particular cigar will last after being lighted. And it's endless. And so that can't be either. And at least in R.J. Reynolds, there was a stopping point. The stopping point was, why are you putting this information on a label? And the answer was to try to prevent people from smoking. If you don't have evidence that it's going to do that, then you can't require that label. You're right, Your Honor. There's always going to be an opposing slippery slope, and it's what you identified. It's also the fact that bigger will always be better. Does it stop at 30, or 50, or 70? They will always be better noticed if they are bigger. Identifying the reducing tobacco use interest puts a stop to that. But to answer your question more directly with regard to nutritional labels, I suspect if nutritional labels were challenged before this court, the government, and they really haven't been, the government would be defending them on more traditional Zotera grounds, which is that they are made in order to prevent consumer deception. In the food industry and the over-the-counter drug industry, manufacturers all the time are making comparative nutritional claims about what's better for you to eat than other things. There's a case, I don't know if you're familiar with it, but it's cited in Zotero, where in the Seventh Circuit, the FTC got an injunction against the American Egg Institute because it was advertising that eggs are good for you. And the Department of Agriculture said, no, they're not. They cause cholesterol. The government, I think about five years ago, said we were wrong. And the injunction, I guess, was still in effect, had to be lifted, that ingesting cholesterol-rich eggs doesn't cause cholesterol in the blood at all. So for 20 years or more, the American public was not permitted to know that eggs have beneficial value, at least through advertisements by the Egg Institute. Yes, I remember that footnote in Zotero, and it was right next to another footnote that said that nothing about Zotero was dealing about how we deal with the scope or size of the warnings. It's just the existence of it. And I would say to Your Honor that that's what American Meat was about. I would direct Your Honor to page 329 of the Joint Appendix where we see the American Meat warning on a meat package. It's almost impossible to see. American Meat was not about the size of warnings. It was about the existence of them. But to go back to your question- In order to enable American consumers to buy American. Yes. And you know what happened to that? The World Trade Organization held that that was a treaty violation by the United States after the American Meat case came down, and authorized a trade war by Canada. And you know what happened next? Congress repealed the warnings that American Meat upheld. So they're no longer in effect. And this court was explicitly skeptical that the government wasn't revealing its true interest in the warning. That's correct, except the court said nonetheless the fact it didn't matter whether the government was revealing its true interest. First it said deception is not required, right? It overruled RJR to the extent that it said that the interest had to be in preventing deception, correct? The Envam Court overruled that provision of RJR, correct? Yes. And second, it looked not only at what the government said its interest was, providing information, but also what the statute talked about, which may have been preferring American Meat. In this case, the statute is a bit like that as well. Certainly clear from the statutory purpose that there's an element of allowing people to choose American Meat. And third, there was never no argument in American Meat that you had to prove that putting on the label would have people choose American Meat. That's what you're arguing here. The problem here is not what the purpose is. Your claim is the government can't prove it will reduce the amount of smoke. But we never required that before. Well, let me take each of those points in turn. First of all, the Envam Court in American Meat was very explicit about what it was overruling in RJ Reynolds. And it was only this assertion that Zauterer only applies in situations of preventing consumer deception. Second, when the American Meat Envam Court talked about the interest in question, it always tied it back in to what the consumer was doing. It talked about the interest in consumers knowing where a product came from in the event of a food-borne illness outbreak in a certain country. Why? Because obviously people would shy away from that product in such circumstances. Well, no, it provided them with information from which they could make a consumer choice. This is the classic conservative position that disclosures provide the opportunity for choice. They don't force anybody to do anything. They provide the opportunity for choice. That's why Zauterer was established, was issued, because Zauterer said it is far less to simply require disclosure than to restrict in the first place. Isn't that right? But, Your Honor, in these circumstances, it drew from extensive findings in the statute about the preferences of consumers for American meat. Judge Williams, in his opinion, identified the governmental interest as enabling, despite the government's disclaimer, as enabling American consumers to buy American meat. Right? Yes. And as far as the proof is concerned, I think Zauterer or American Meat acknowledged that the Supreme Court, in Enfeld v. Payne, required evidence to support whatever the government interest is. Right? And Judge Williams, in that court, said it's self-evident here that if we tell them the product, whatever the beef, was born, raised, and slaughtered in the United States, that will enable the American consumer to buy American. And it's self-evident. So he didn't need the proof. Question. Is it self-evident that 30% labeling on a pack of cigars is going to reduce smoking by cigar smokers? No, and especially not on this record, where the agency says in its final regulatory impact analysis that there is no credible evidence that the warnings will reduce the use of tobacco. It's not apparent on this record where the agency disclaims studying any of those interests. It's not apparent on this record after RJR, where it actually studied a 50% warning on cigarettes and found, after an extensive study, that it would only reduce use by 0.088%, a number that was indistinguishable from zero. So it is not apparent here. And Your Honor, when Your Honor took up the American Meat case, in a subsequent panel opinion, which remains binding, the National Association of Manufacturers case versus the SEC, there the ability of the disclaimer to affect the result that was being sought by the government was challenged. And this court correctly pointed out, relying on Edenfield versus Payne, that the government has the burden of proving that the disclaimer will alleviate the identified harm by a material degree and it can't rely exclusively on conjecture and speculation. Sorry, was NAM post-American Meat? It was. It was, Your Honor. But it didn't apply Zouder, right? It did. And I think Judge Randolph knows it particularly well, having written it. Well, he may have written it, but I'm reading it right now. It says, in answer to the SEC's open question, we therefore hold that Zouder has no application to this case. So Zouder was not what was applied in National Association of Manufacturers. But we have to continue reading, because what happened in the ensuing paragraphs, and I'm afraid I don't have the page committed to memory, was that the court said that there's a lot of dispute about where and how Zouder applies. So we're going to take this issue off the table. We're going to rest our holding on applying Zouder to the record in this case in a full-throated manner. And then went on for four pages of the federal reports to explain how the SEC conflict mineral disclosure did not satisfy Zouder's attest on its own terms. And keep in mind that the first line of defense there for the court was that it did not drive the government's results. If there wasn't enough evidence, it would alleviate the harm to a material degree. The SEC was only after that and said, oh, by the way, if we have to reach this, there are questions about whether this particular disclaimer is purely factual and uncontroversial. So this National Association of Manufacturers versus the SEC is the post-American meat case that deals with the situation where the efficacy of the warning is challenged. And I would take the court to go back to your Honor's question a few series ago. There was an argument, very much so in American meat, that we should not have a purely informational interest. And that argument was made by Judge, now Justice Kavanaugh. This was a separate opinion. It was a separate opinion. But what Judge Kavanaugh said was that he was thankful that the majority opinion wasn't relying on purely informational interest. And certainly the En Barne Court had an opportunity to clarify that. I found that opinion pretty persuasive, but I think it cuts against you on this one point. Because he says he is very concerned with Judge Randolph's counter-slippery slope. But the way he draws the line is he says traditional health and safety warnings are okay, and other kinds of more novel, edgier, more ideological warnings, right, like was the product made by illegals or did the doctor perform abortions. That's on the other side of the line. But health and safety warnings are okay. But if that's the line, this part of your argument about government interest fails. No, I don't think that was the line, Your Honor. I think Judge Kavanaugh was talking about the dangers, especially in terms of the scope of warnings, of recognizing an interest in purely improving information. And if that interest were recognized, it would lead to what he called a circular analysis, where any warning would provide more information. And if it were spoken more loudly, it would provide more information and better information. And there would be no meaningful First Amendment limit to the compulsion of the speech, and that was intolerable. He also observed that many health and safety warnings would satisfy this inquiry and would survive it. And we think that many health and safety warnings would. But in this case, he says the government has long required commercial disclosures to prevent consumer deception or to ensure consumer health or safety. These interests explain and justify the compelled commercial disclosures that are common and familiar to American consumers, such as nutrition labels and health warnings. Yes, to ensure consumer health and safety. Being better informed does not by itself ensure consumer health and safety. The outcome that ensures consumer health and safety is stopping the use of tobacco or not abusing it. And that is why the court in RJR required the FDA to demonstrate an interest in reducing tobacco use. Yes, I might not have gone to the best language on this point, but, I mean, he also upheld a requirement that seemed to be formulated in terms of conveying information without a separate focus on the question whether consumers would shift to American meat. I don't know what passage you're referring to, but I'll take a look at it during the hiatus. If there are any further questions, I would just like to close this segment by saying the following. This is not a situation where the First Amendment issues have to be decided in the abstract. We have a regime in place where there are warnings on nearly all cigar products. It's been in place for a long time. We are arguing for the modest proposition that they should be studied before moving to a larger, more intrusive regime. We believe that's what's required. I'm glad you raised that point, and therefore suddenly I realize I'm surprised. You skipped the arbitrary and capricious argument altogether. Now, I assume you would agree that we have to first conclude that this is not arbitrary and capricious and vacate on that ground before we would move on to the First Amendment. Ordinarily, the courts do try to resolve non-constitutional grounds. That's more than ordinarily. We're not supposed to reach constitutional questions if we can resolve the matter on a non-constitutional ground. Isn't that right? That's right. That's not what the court did in R.J. Reynolds, but it is the ordinary courts. And we do believe that it is arbitrary and capricious. And specifically, we believe that the FTC scheme constituted a significant regulatory alternative that needed to be studied with some meaningfulness before it was dismissed. It was one that was raised in the comments, urged upon the agency. Your argument is under D-1, that the FDA did not comply with D-1. Is that it? Well, that's another argument. I mean, the one that I was just articulating was that the FTC scheme, no matter how you think about it, given the fact that it was in place and available for study, was a significant regulatory alternative that needed to be meaningfully dealt with under this court's Delaware Department of Natural Resources. You thought both that it's arbitrary and capricious for failure to consider alternatives, arbitrary and capricious for not making the determinations required by the statute, right? Yes. And I assume arbitrary and capricious because there wasn't substantial evidence supporting their government's claims. And it didn't deal with the comment. But to go to both of your questions, we also contend that the agency did not deal with a significant aspect of the problem by not going through the 906-D-1 analysis. Here we don't need to conclude that under any regime that reducing tobacco use is the only qualifying interest because Congress told us what the interest is. They told us that under the specific section of this Act that the agency invoked to put the warnings in place under 906-D-1 and said that the agency needed to take in the labeling changes, propensity to reduce tobacco use. And here the agency punted on it. It stayed away from it like it was a hot potato. And it did that because of its negative experience when studying the issue that came out of R.J. Reynolds. We respectfully contend that in doing so the agency did not deal with a significant aspect of the problem and it violated its responsibilities under 906-D-1 and the case should be remanded. I was surprised to hear you say that R.J.R. violated the usual rule and went right to the First Amendment. But as I read it, R.J.R. says that the challenge was the First Amendment challenge. Was there anything about an arbitrary and capricious challenge? So there were both. There was an arbitrary and capricious challenge in the First Amendment challenge below in the district court. Judge Leon in the district court proceeded directly to the constitutional issues, bypassing the arbitrary and capricious question, and then the court only reviewed the constitutional question when it came up on appeal. But both issues were presented for the court on appeal. Do you have any argument for how we could or why we should consider a constitutional question if you are right, that it's arbitrary and capricious under the APA and the statute? Any argument for giving an advisory opinion on the constitution? Well, Your Honor, what I'm urging the court to do is to vacate the rule and remand it to the agency to do the proper analysis. And if this court reaches that conclusion through the analysis of the Administrative Procedure Act or the Family Smoking Prevention and Tobacco Control Act, we would have no question with that. We absolutely would not be criticizing the court for that. The result that we think is warranted under the APA, under the statute, under the First Amendment, is that the rule be vacated and remanded to the agency. Any further questions? Thank you. Thank you. We'll hear from you, Your Honor. May I please support Lindsay Powell for FBA? Starting with the constitutional question, I think it helps to sort of reset and remember what is conceded in this case. First, there's no question that the warnings at issue are factual and uncontroversial in the way that the auditor contemplates. Plaintiffs don't dispute that. They agree that cigars in general, setting aside the specific issue of premium cigars, can be required to bear the particular textual warnings that are required by FDA here. Their only dispute is with respect to the particular size chosen by FDA. And even there with respect to size, plaintiffs say in their opening brief that a larger disclosure would improve the communication of the government's message. Do the warnings apply to the boxes, the cigar boxes? Yes, Your Honor. I think it's very helpful here to be aware of the very broad universe of products we're talking about. So people often think of premium cigars, but in fact many cigars are sold in smaller boxes that look just like cigarettes. So we're talking about— Cigarillas. Exactly, Your Honor, yes. So that's a very large share of the market. Premium cigars by volume make up only 10% of the market, and those can be sold in larger boxes. And it also applies to—I forget. Did the FDA define advertising? Yes, advertising is defined. What's the definition? I don't have it at the ready because it hasn't been put at issue here, but it would cover communications in or outside of stores, for example. Communications about? About a particular brand of cigar, for example, or a particular— There's a magazine called Cigar Aficionado. Let's assume that the magazine typically monthly has 100 pages, and it's all advocating cigar use. Does that mean 30 of those 100 pages have to have big black letters and pure black borders? That question doesn't bear on the way thinkers are bringing their facial challenge to this theme here. Certainly in a publication about— It is a facial challenge, but there's a doctrine under the First Amendment that if it's unconstitutional in some of its applications, then you strike the—whatever the statute of the regulation—down. I don't think it's some of its applications, Your Honor.  Broadwood versus Oklahoma. Right, but so it's a substantial number, and— What about advertising on the radio? If you have a 30-second ad, does that mean you have to have nine seconds of telling people how awful cigar smoking is? It does mean that you need to have a warning that's on average 12 words, which is substantially less than the length of the warnings that are required for many drugs, and those advertisements persist on the radio and on television nevertheless. I would also note that Congress, through separate legislation that is not challenged here, has actually prohibited the advertising on the radio and on television of certain tobacco products, including little cigars. All tobacco products? Of certain tobacco products, including little cigars. So it does cover some of the universal givens here. Right. But with respect to, again, places do suggest in passing that radio advertisements could be burdened by this. Again, even assuming that's true, it's not enough to sustain a facial challenge, and they don't explain how it can be true that 12 words could be so burdensome as to overwhelm the rest of the message, particularly when we have other examples out there of products for which more burdensome warnings have long persisted and manufacturers have nevertheless figured out how to convey their messages alongside them. And when we're talking about the 30 percent warnings for the packages and the 20 percent for ads, the example of smokeless tobacco is very helpful here. So Congress put that requirement in place over a decade ago, or a decade ago, through the Tobacco Control Act, and it has been in effect for that duration. The Sixth Circuit upheld it against a First Amendment challenge in the discount tobacco case, and we know from that experience that manufacturers have not been put in the position, that's out of our contemplate, where they're no longer able to undertake their own. Well, when they do smoke tobacco, smokeless tobacco in those tins, the message is on the tin? The message has to occupy 30 percent of that top panel of the tin. And somebody goes to a tobacco shop and buys a single cigar. Mm-hmm. Where's the message? It depends on how the cigar is packaged. Some individual cigars are wrapped in cellophane or come in a tube. Right, with a band around them, right? Yeah, so if there is – it can get complicated. If there is space on the tube or on the cellophane, the warning goes on there. If not, it goes on the broader product package in which the individual cigar is. But that could be behind the counter. I'm just trying to understand how the consumer – I go into a tobacco shop and order an Upton Churchill cigar. I think there is such a thing. I don't smoke. But anyway. And I get it. It cost me $25. And now I have it. And how have I gotten a warning? So, again, it depends on the particular cigar and the way that it's being sold in the store. But it can be on the packaging that goes around that individual cigar, or it can appear – if that's not an option, it can appear on a standard letter size paper posted at the point of sale at the cash register at the store. So you will see it at some point during that purchase. If it's on the package, it has the added benefit of you will then see it too before you consume it. So the store owners have to provide this, not the manufacturers? The store owner does have to display the paper at the point of sale if they choose to sell individual cigars that don't carry the warning on the product package. But, again, some of these harder questions only come up when we're talking about premium cigars, which, again, is 10 percent of the market by volume. That's a small fraction of the universe of covered products that we're talking about here. And most of the questions that's being raised simply don't apply to the other products. These are questions that will be addressed in the subsequent rulemaking, is it? Potentially, Your Honor. So there is an ANPRM, which I believe Your Honor is referring, soliciting further information about premium cigars. FDA in that ANPRM did reiterate its findings from this rulemaking, which is that the current state of the evidence did not support different treatments for cigars, that it didn't find that either inherent characteristics of those products or patterns of use made these warning statements untrue with respect to cigars or obviated the need to provide them. But FDA is soliciting additional information and considering comments, and if further regulatory action is appropriate, it will take it. And that's always the case. I mean, agencies retain their ability to reconsider questions as appropriate, but it doesn't call into doubt the prior regulation to any extent. Can I ask you about how SAUDERER works in this context? So assume I agree with you, SAUDERER applies, and you have a sufficiently important interest in disseminating truthful, non-ideological health warnings. It's still the question of fit and tailoring, and there are at least three different strands of that reasoning that run through the cases. But one thing that's perfectly clear after NIFLA is that one element of that inquiry is about whether the regulation is unduly burdensome, and it's equally clear post-NIFLA that the government bears the burden of proof on that question. Yes, Your Honor. Agree? Yes, Your Honor. So how have you satisfied your burden of proof on the question whether 30% is too burdensome or not? Particularly in the face of affidavits where advertisers say, you know, look, if I have to do this, if I have to put this disclaimer in my ads, I will forego certain entire categories of advertising. Yes, Your Honor. So I think it helps to begin with unpacking a little bit what the unduly burdensome standard has referred to in these cases, including in NIFLA. And in almost each one, when a court has found a disclosure to be unduly burdensome, it's then because it sounds that it effectively rules out the manufacturer's speech, so that it will effectively preclude the manufacturer or the service provider from undertaking that speech altogether. Chills. Chills. The cases do sometimes use the word chill as well, but in fact, in NIFLA, the one example where they discuss unduly burdensome is the billboard. And they found that at least as the court went through that reasoning, it was premised on the conclusion that providers wanting to engage with... The pro-life pregnancy counselor can't realistically put up the billboard that says choose life. Right. If they need the whatever it was, 20-word disclaimer in 13 different languages. Precisely, Your Honor. So it effectively precludes the billboard altogether. And why isn't that analogous to the situation here where the advertiser says radio time is very expensive and if I'm buying 30 seconds and I only get 20 because it takes me 10 seconds to say those 12 words, I won't buy those ads. Right. I think it's very helpful to look to the existing universe of information, including drug ads. So we know from our own experiences that drug ads are very expensive. We see them all the time on television. We hear them on the radio. They are required to say many more than 12 words in those ads. And yet those ads persist. Manufacturers have made the assessment that it is still worth it to communicate, and they are still able to get their words in there. It's not as though it's eating up a majority, much less the entirety of the message. So the idea that it makes it somewhat less appealing, sure. It's less appealing for a manufacturer to have to let people know, in noticeable products they're likely going to do bad things to you. But the fact that it... I mean, I guess I'm thinking of package warnings in that context. It's a lot more than 12 words, but it's usually an insert, right? I think many over-the-counter drugs certainly have a great deal of that text on the package. I think a great deal as a percentage matter, and we do note that in the brief. I mean, at 30% or 20%, it's much less than half. And the 30%, too, I should note, is 30% of the two principal display panels. So that actually is a number of other display panels, too. So it's actually greater than the 70% that the 30 number suggests. But there's been no explanation here as to how the remaining space will be inadequate for the brand information or instructions or any of that. And the Sixth Circuit found that it was adequate. Yeah, but pre-NIFLA sort of equating Zotero to almost rational basis review, which is not realistic anymore. There's some examples in the brief of ads or packages where the 30% warning is obtrusively stamped as a rectangle in the middle of the ad. And the overall effect is it has a feel of someone is trying to speak in the background and the government is literally stamping out the speech. So my question is, would it be permissible under these regs for the advertiser to place the warning in, let's say, the bottom 30% of the ad and we, the speaker, take the top 70% and then put the warning all at the bottom? I think with respect to packages, that's permissible. How about ads? I believe for the advertisements, it does refer to the top. I think it says in the top half. It says in the top half. But what it doesn't say, and I think this is a very important point, what it doesn't say is design your ad, design your packaging, and then place this warning right in the middle of it. So the images that your interviewer is referring to are mock-ups produced by plaintiffs that are emphatically not what they used to look like. I mean, your point has a lot of force with regard to the packages, but with regard to the ads. Well, it's still just a question of location. I mean, you can still design around it, so it does need to be in the upper area, but it doesn't mean it goes on top of the manufacturer's own message. I don't think any of the precedents out there suggests that something like the location is what makes the constitutional difference. And again, you know, sort of bringing it back to the core of what we're talking about, I mean, this is the type of uncontroversial standard product safety warning that NIFLA reaffirmed that it wasn't calling into doubt. I understand, but there's still the undue burden of inquiry. There is still the undue burden of inquiry, but this is very different from, you know, for example, the Third Circuit case where in order to excerpt part of a Supreme Court opinion in your legal advertising, you had to include the text of the entire opinion, which just made it impossible. It's very different from in Venice where, you know, to include all the required disclosures or disclaimers would truly preclude you from using the credentials on a business card or a letter. Maybe so, but let's take another data point, which is much more highly analogous, which is American beverage. Ninth Circuit, in-bank, post-NIFLA, I forget the exact number, sent a 20% or 30% warning about sugary drinks, and they say government loses because they failed to prove that you need 20% as opposed to 10%. Right, and actually in... And they were unanimous. They split on the reasoning, but, I mean, 11 judges on the Ninth Circuit unanimously thought that that doesn't survive the post-NIFLA version of Sauter review. Right. They made clear, however, that it was very specific to the record in that case and took pains to say that they were not suggesting that, you know, by any means that other comparably sized disclosures would raise the same issues. So there the government's own evidence supported the contention that a 10% warning instead of the 20% warning would effectively convey the message that it was the government's interest to provide. And on that record, there was no justification for the larger size. Here, there is ample evidence, and Plano's own concession, that in the context of tobacco products, that a larger warning helps consumers better understand and appreciate these undisputed risks. So there is no question here. There's no American beverage problem about whether 30% will really do more than 10%. That is just clear on this record. The First Amendment analysis is supposed to balance speaker burdens against government interest. And the government's articulation on the First Amendment point really only addresses half of that equation. The government's theory, bigger is better, right? The bigger the warning, the more likely it will make an impression on the consumer. And that's perfectly fine as far as it goes. It strikes me as at least plausible. But it's only half the equation. Well, I think... Where does the government balance, you know, bigger is better for purposes of the government interest against bigger is worse from the perspective of the advertiser? I do think it's worth bearing in mind that when we're talking about Zouder, that the First Amendment interest is largely on the part of the consumers receiving the information. So it's, of course, true that manufacturers also have a protected right in the speech, but the Zouder doctrine is premised on the notion that the main value of commercial speech is in providing information to consumers. It's premised on the notion that there's minimal interest in suppressing the warning, but then there's a separate concern about chilling the affirmative protected commercial speech. Yes, Your Honor. That is, of course, it, too. But, you know, in flagging the acknowledgments that bigger will communicate better, I don't mean to suggest that that was the entire motivating principle here. If that's what FDA was going for, it wouldn't have stopped at 30 percent.  But that's all I found. In the sections of the final rule where they defend the warning, explain the warning, that's their rationale. Bigger is better. It'll make a better impression on consumers. This is what Congress has done with regard to smokeless, and this is what is done in Europe under that treaty and EU regulations. Yes, Your Honor. So I think the question is, what is big enough to effectively communicate to help consumers better understand and appreciate this information? And so that was the way FDA approached this. How big do these need to be for that message to get through? And when they got to 30 percent, based on all of the information that Your Honor has identified, which is a substantial record, supporting the need for them to be at least that big, it stopped there. They didn't say, well, you know, if 30 is great, let's double that for good measure. It said they need to be at least this big to further the very important public health interest that we're getting at here, and then stopped at that number, consistent with the past practice both here and abroad, the findings of Congress, the Institute of Medicine. Since you've mentioned abroad and the treaty, on what basis does the government think it is proper to rely on what the World Health Organization, which is an arm of the UN, says? That's a political party. Your Honor, I know the treaty was never ratified by the United States. Would it have been self-implementing if it had been? It did. The United States was the signatory, and that in any event is not the exclusive data point for the 30 percent finding. So Congress, well before FDA got to this rulemaking, itself undertook findings of facts and selected a 30 percent warning requirement for smokeless tobacco packages. And again, those have been in effect for a decade with no observable detriment to the industry. Manufacturers of smokeless tobacco continue to market their products. They have designed their packaging around those warnings. And so FDA recently relied on Congress's findings. The district court relied on the World Health Organization as well. Right, and we cite that. I mean, an international consensus does not to us seem irrelevant, but to the extent Your Honor is concerned about that, it's not necessary. How many of those countries that did ratify and sign the treaty have a First Amendment? I don't know the answer to that, Your Honor. None? I don't know the answer. I take it the Institute of Medicine, which is an American federal government premier science agency, said the same thing. It did say the same thing, Your Honor. And on the question that Judge Katsos was asking about whether the agency weighed the burden on the cigar retailers and manufacturers, the Federal Register notice says that they did weigh that, and they say that although it will occupy at least 30 percent of the packaging, there will remain sufficient space for additional warnings, manufacturers, instructions, and branding. And in that regard, they say it's consistent with the First Amendment. So I take it they did weigh the other side. Yes, Your Honor, they did. I don't know how you weigh these kind of things, but they gave the reasons on both sides. Yes, Your Honor, they did. And again, that's consistent with the Sixth Circuit's finding in discount tobacco. That was the analysis undertaken by that court in considering whether the smokeless tobacco and cigarette warnings would be unduly burdensome within this outer framework. What kind of information would the First Amendment prevent the government from requiring with respect to just cigars? I mean, it's something across the line from being factual and unconstitutional. You conceded that the information that these warnings provide will not have an effect on people that now smoke cigars or may take up the habit in the future. We do not concede that. That's simply not the case. We're not relying on an interest in the future. You have no evidence here. We cannot dispositively prove or have not endeavored to dispositively prove here. Can you prove anything about the usage? That's not in the record here, but that fact does not amount to a concession. It's not in the record, and that's all we have is the administrative record, right? So what information is it that the government could not require manufacturers and retailers to provide with respect to cigars? Again, anything that crossed the line from the factual and uncontroversial would take it outside of the doubter doctrine, and it would be subject to heightened scrutiny. So anything about how the product was farmed, raised, species rolled, transported, how long it will stay lit, all that the government can provide. And it can do it under the heading, this gives information to consumers, and we don't have to prove what effect that information will have on the consumer. And that's consistent with American Meat. Some of the examples given in that case included fabric content, care of clothing, disclosures about basic product characteristics that could be material to consumers using or choosing whether to use those products. So, yes, those sorts of informational interests are relevant. They cannot be so burdensome. Is there any stopping point? See, undue burden is a stopping point. Well, I suppose one stopping point would be they couldn't put on a label saying it's from a conflict zone. For example, Your Honor. But, right, so if it causes the burden to being controversial or if it just takes up so much space that the manufacturers can't speak, the doubter cases say that that's too much. At that point, you may be talking about a restriction and subject to scrutiny under Central Hudson. But at 30 percent, we don't have that here. There's ample space on the packaging for their branding, for their images, for their instructions. And we know that from the smokeless tobacco contract. In the Bacara case, Justice Thomas, writing for the court, said that there were alternatives to the notice that the clinics had to provide. And one of them was that the California government itself can speak. And it can put on advertisements, programs, clinics, brochures, pamphlets, whatever, to inform women of what their choices were. Does the FDA have a budget that enables it to advertise? Two things, Your Honor. So in that discussion, that regarded the license notice, the notice required for licensed facilities. And the court observed there that the notice didn't have to do with the services being provided by the facilities themselves. It was just a requirement to let people know about what the government was doing. And so for that reason, it lacks the requisite nexus between the services or goods at issue that's required for a governor. Here, the disclosures have everything to do with the products that are being sold. They discuss the inherent traits of the product. So that part of NUSLA is distinguishable on that basis. FDA also explained in this rule that it's very important to have the warning on the product packages, because consumers then notice them at the two most important points of time, which is when they're choosing whether to purchase the product and when they're choosing whether to use the product. And an informational campaign where the government wouldn't convey the same information at the same moments in time, and FDA found that very relevant. Could I just ask you about the statute for a minute? We've talked a lot about whether, for First Amendment purposes, the government interest in conveying information is sufficient. But this statute requires the government at least to consider impacts of the warning labels on smoking behavior, how many smokers are likely to quit, and how many nonsmokers will refrain from smoking because of the warning. Right. So the statutory provision as a whole, the finding that Congress is required to make, is whether a provision is appropriate for the protection of the public health. And that must take into account, as the owner said. And I didn't see anything. I haven't read every word in the order, but I did look at everything the district court cited and everything my law clerk found. And I didn't see anything in the agency's justification that spoke about impact on smoking behavior, as opposed to this other interest in just disseminating information. So, I mean, FDA certainly considered the benefits that the rule could have, requiring this warning could have for the different populations mentioned in this provision, and considered any issues raised in the comments about possible detriment to those populations. For example, some commenters raised the possibility that larger warnings could cause people to go numb to the message of the warnings. And FDA considered that, found that that was not a substantiated risk, that it was unlikely that they would backfire. But every time they specifically addressed warnings, they framed their analysis in terms of the effectiveness of the warning, not in changing smoking behavior, but in conveying information. And that's not enough under this statute. It is enough under this statute. The statute doesn't require. This statute broadly applies. This is FDA's authority for many different types of populations. Sure. Appropriate for the protection of public health, which is a very broad criterion. And it would be extraordinary to read. But it goes on to say, that criterion shall be determined, taking into account two factors, and they are the impact on smoking behavior. Right. So, to read this provision the way plaintiffs suggest would be to conclude that Congress intended to tie FDA's hands so that it cannot regulate tobacco products unless it has concluded that there are measurable behavioral effects. Another reading of it would be that, at a minimum, the agency has to take that into account, which is the words of the statute. Yes. And I don't see where the agency did that. I think further, Your Honor, take into account available evidence concerning these issues. Nothing in here suggests that FDA must go forth and create new studies where none exist. The finding number 41 that Congress made said exactly that, that the FDA has the expertise to conduct studies to determine the impact on consumer behavior of labels. That's what Congress found that. And you say, no, that you don't have to do any studies. I say that this statutory provision, nothing in the text here, ties FDA's hands so that it cannot regulate tobacco products without, in each case, undertaking a finding that can dispositively show how behaviors in the world will change. It's a very difficult thing to prove. There are an incredible number of things to control for when you're talking about addictive products of this type, and nothing in here commands that reading. Suppose I think that the agency at least needs to take into account impact on smoking behavior. What's your best site or two in this long final rule for where they did that? I would need to follow up with the site. I do think you can reason from effectively providing information to people to putting them in a position to change their behavior. Again, behavioral change is not the interest on which the agency relies, but it's not as though it was indifferent as to that result. The legal background, the statute isn't passed in a vacuum. It's passed against the background of R.J. Reynolds, and we've been talking at great length about this question of what interests qualify. And Congress says at least consider the, I don't know if it's narrow or broader, but at least consider the interest that was asserted in R.J.R. about smoking behavior. Well, it certainly wasn't referring to R.J.R., and I think what is sufficient as an informational interest or a government interest generally for the purposes of the First Amendment inquiry is different from what you might think about a statutory requirement. If the order had said, in the face of this statute, if the order had said explicitly, we do not know and take no position on whether warnings would have any impact at all on smoking behavior, but we think they're important in order to convey information to facilitate consumer choice, would that explanation survive under the statute and the APA? If I might tweak this a little bit, I can answer the hypothetical directly, if you determine that would be more helpful, but I think in the absence of available evidence measuring behavioral change in the world, which, again, is exceedingly hard to do, what the statute is trying to get at is taking into account increased or decreased risk to different populations. So in parsing out these populations, it's looking at effects on current smokers and effects on people who don't yet smoke. And so there may be certain regulatory measures that could benefit one of those groups while creating harm for others, and so what this requires is that FDA take into risk and benefits for both those groups and satisfy itself that it's not going to increase overall smoking use as a result of this, and there's no risk of that here. There's no suggestion anywhere that the requirement for larger warnings is going to increase anyone's risk of use. You're fighting the hypo a little bit. So the hypo I gave you is they explicitly disclaim any knowledge or opinion on smoking behavior. You're positing a second hypo where they say they consider smoking behavior and they say, gosh, it's really hard to assess, but we think warnings are important nonetheless. Put that one aside and answer mine. So if the agency has concluded that there is no evidence with respect to smoking behavior... I'm just agnostic. You just say we don't want to get into it. We got into that in RJR. We went down a rabbit hole. It's hard. We have now come up with an independent theory, legal theory, that doesn't require us to get into that, so we're not going to. Well, I think there may be other ways for the agency to express that it has satisfied this weighing of risks for different populations and that it has reached a conclusion that it's appropriate for the public health insofar as it will only benefit these different groups, that there is no risk of increased smoking as a result, which is what this gets at. But I also want to be clear that that's not what we have here. The FDA did say, it concluded in its regulatory impact analysis, that these risks are very hard to quantify for many reasons that are explained in that analysis, and so it was not able to produce that type of quantification. But that's not to say that it didn't consider the different ways in which the warnings would benefit different populations of users and non-users. And it also considered, as I mentioned, the suggestion that it could actually be harmful to require larger warnings because of this numbing effect, and it concluded that there was actually no such risk. So we have on the record here only ways that these warnings can provide a public health benefit. It provides more information that people can better understand, and with that information, people can make choices. There is certainly a hope that people make choices that benefit their health, but the statute does not require that FDA, in each instance, before it can begin regulating, make a very difficult, dispositive finding about measurable behavioral changes in the world. That's not what Congress said here, and it would really do harm to... I'm trying to figure out exactly what you mean by this. So is this, just to take an example, vaping, electronic cigarettes. Is the idea here, is what you think the idea of this provision is, too much restriction on vaping might lead to people smoking more, too much restriction on advertising about cigars may lead to people using, chewing tobacco instead, too much restriction on certain kinds of things may lead to youth smoking. Is that what they're talking about, rather than the question of whether the warnings will effectively reduce smoking? Yes, Your Honor. So precisely as your example suggests, there are conceivable regulations that, although they might benefit one group, as for example, by helping someone switch to a product farther down the risk continuum, if that product also appeals to youth in a particular way, and presents a risk of increasing use of tobacco products, that's the type of analysis that this statute contemplates. It does not say anything about requiring studies or findings showing measurable behavioral change as a result of each and every regulation that FDA has authorized by the statute. Congress through the Tobacco Control Act was empowering FDA to regulate tobacco, not trying to tie its hands. There are, aren't there countless studies about the effect of warnings, labels, disclaimers, whatever, on consumer behavior? Not in the record here, Your Honor. Oh, not in the record, but in the Library of Congress. There are, I mean, there's tons of studies about that. I've read some of them. People have never committed that at this point. The agency just doesn't rely on any of them. Not in the record, as you say. Not in the record, no. And the agency has, in other contexts, discussed the problems with many of those studies and the problems with trying to quantify behavioral effects, which is why they are not quantified here, and the statute does not require them to be quantified. FDA very comprehensively considered the advantages and arguable risks of these marginally larger warnings, the 30 percent of the package and 20 percent of the advertisements, to bring cigars and pipe tobacco warnings in line with smokeless tobacco. But many social scientists have, in fact, quantified the effect of the label. I think Kahneman and Tversky did all kinds of studies on that. I'm not aware. You can't be dispositive, but plenty of the economists and social scientists are dispositive about the effect. It's not what the statute requires. The text of the statute doesn't require that an FDA appropriately consider whether these warnings would benefit both users and non-users of the product, and so no reason to expect that this would do anything but improve the public health, making it appropriate within the meaning of the statute. Okay. Thank you. We've let both of you go over time by almost exactly the same amount. We'll give you a couple extra minutes to wrap up. Thank you, Your Honors. Just a few points. First, all of the findings in the final rule and the proposed rule focused on this interest in effective communication of information. There was nothing specific to warnings on tobacco use. The only time where reducing tobacco use is mentioned is with regard to findings with regard to the whole rule, which doesn't really address the 9061 question. The 9061 only applies to the marketing restriction, not the effect of the whole rule, and even there the analysis was very light and conclusory. Respectfully, we think that the agency's avoidance of any serious analysis, much less study of the issue of whether these warnings reduce tobacco use, was a strategic attempt to avoid the result of the RJR study, which raises serious questions about whether larger warnings can reduce tobacco use after all. I'm sorry, 906 is 21 U.S.C. 387-F? That's right, Your Honor. The 906-D1 of the original act. And that says the Secretary might, made by regulation, require restrictions. Yes. Are those restrictions ones, do those restrictions include ones that arise from the deeming, or are they just the separate ones, the youth, the prohibition on selling to youth and the warnings here? So there was a bunch of stuff going on in the deeming rule. One thing that happened is- The deeming rule triggers a whole separate set of consequences. Exactly. So there's Section 901 authority that allowed the agency to deem products subject to the act that triggers a series of consequences that aren't before the court now, and then there were additional provisions that were put on through 906 that was age restriction on sale and the warnings. So 906 is the grounding for the warnings requirement, and our view is that the warning requirements specifically needed to be studied under 906. And what's the basis for that? The statute seems to me crystal clear that there has to be consideration of impacts on smoking. Yes. But I'm not sure it's crystal clear that they have to disentangle the impacts from the warning piece of this regulatory initiative from the other pieces including the youth marketing prohibition or the youth sale prohibition as to which the impact would be self-evident. I understand your question, Your Honor. The omnibus finding that I'm talking about, I can get you a citation for it, referred to the effect of the final rule on reducing tobacco use. Which did not disentangle warnings. It didn't disentangle warnings or any of the marketing restrictions. Why did they have to? It just talks about such regulation. Yes. It's a little ambiguous. I understand. So, at a minimum, we believe 906 requires the agency to focus on the restrictions that are being imposed through 906. Right. So, I'm thinking perhaps if the agency had a finding that said, well, between the age restrictions and the warning requirements, the 906 restrictions will reduce tobacco use, that would be a different case. The agency didn't make that finding. The agency said the whole final rule will reduce tobacco use. And the weight of the final rule is all these automatic provisions that occur through the deeming decision under Section 901 of the Act. So, I thought it was the set of things that flowed from the exercise of regulatory authority. Not the whole rule, including deeming, just the advertising restrictions, the restriction on sale to minors, and there's one more, I think it's vending machines. Exactly, Your Honor. It refers to the final rule in total. And the exercise of the deeming authority under 901 was an exercise of regulatory authority. It wasn't required. The agency had to justify that decision as well. So, it never looked at these particular issues. Even putting that omnibus finding aside, we don't think that's sufficient to really have the meaningful taking of account of issues that the statute requires. I mean, you can't just conclude that you need to explain it. And at a minimum, there should have been an explanation for why the warning requirements drove this reduction in tobacco use. Of course, patience with me is probably running out, but I would just conclude with the fact that I think what we heard from the government... You're not impatient. You're providing information. That's your job. No, I understand. Help us make an informed decision. Informed decision, yes. You may or may not influence the result, but I do know it does give us information. It all ties into what we're talking about. I think the government's argument in its brief at the podium today is really urging on the court an extremely light touch when it comes to Zahnerer and its analysis of the size of the warnings. A light touch that puts the burden on the speaker to show that there's a chilling effect on his speech. And I would refer the court to page 28,988 of the final rule that's in Volume 81 of the Federal Register, where the agency explicitly puts the burden on the commenters to demonstrate that the 70 percent that's left on packages, the 80 percent that's left on advertisements, isn't enough. And I think if we were to adopt the government's position on the level of scrutiny that's required under Zahnerer and kind of defer to the government on how big is enough, we would be breaking both from American meat, I'm sorry, American beverage out in the Ninth Circuit, which required a demonstration by the government that smaller warnings would not suffice, but we'd also be breaking from a series... Well, opposing counsel's right that that case rested explicitly on the fact that the defendant's own expert reached a conclusion. It's amazing who they choose as an expert, but an expert said that that size wasn't necessary, right? Well, remember, they were coming from zero, right? And so their expert got up and said, listen, warnings could actually get people better informed about sugar-added beverages. But it did. It rested on an expert finding, the defendant's own expert finding the opposite of what the defendant was trying to... It had done a focus group on a 10 percent warning. But I don't think that the FDA should be rewarded for not examining the prevailing scheme in place right now and seeing whether that's effective to accomplish whatever interest it thinks is appropriate, whether it's effectively communicating cigar health risks or whether it's reducing tobacco use. I think the American beverage court is very clear that the burden is on the government to show that lesser intrusions will not suffice, and I think that's absolutely consistent. So it has to be the least restrictive alternative? No, no, no, absolutely not. But as you get to each lesser one, then you have to address the next lesser one. Well, fortunately in this case, we're not left with this kind of infinite series of alternatives. And that issue has been addressed in various cases before the Supreme Court and this court to say, listen, we can't just go on forever and ever and suppose that 25 percent or 18 percent or 17 percent... Here we had absolutely no study of the prevailing warning scheme that was in place for the last 17 years, that was fully implemented in the United States, that was available for study and analysis. That sounds like you're arguing it's arbitrary and capricious. Well, I think it is arbitrary and capricious. I also think it violates the First Amendment. There's no less restrictive test. It must be that the government has the discretion to impose the most restrictive labeling requirement, and that can't be right. That's right, and I think we go back to Central Hudson. There's this debate about whether Central Hudson is the least restrictive means or something else. What the cases have consensus on is that the government has the burden to show that less restrictive alternatives, alternatives that are less intrusive on First Amendment... I notice that in the government's brief, you argue, and then quote, that you argue for a less restrictive option. It shouldn't be alternative, which is only a choice between two, but an option, a less restrictive option. And the government comes back and says that the law is not that it has to be the least restrictive, which is not what you're arguing. That's not what our argument is. We could confront that in a different case. Here, we think that the government had to engage in some analysis of why the FTC option would fail, would fail to accomplish the government's objectives. And again, I direct the court to page 29066 of the final rule. Therein, the agency deals with the FTC formatting requirements in a sentence. And this is not what the First Amendment can tolerate, and frankly, I don't think it's what the Administrative Procedure Act can tolerate as well. Instead, what the agency did is it turned to international consensus, and Your Honor, Judge Randolph, you correctly pointed out that that convention hasn't been ratified by the United States. And as a matter of fact, before the United States signed it, it objected to the formatting requirements of the warning labels for tobacco because they might violate our First Amendment. And I suspect that if that treaty had ever been ratified, it would have been accompanied by a reservation from the United States. And I don't think what one part of the executive branch can come urge the court to say, this is the way we should go and it's consistent with First Amendment principles, and another part of the executive branch or State Department take a different position. All right. Any questions? Thank you very much. Thank you, Your Honor. Very informative on both sides. We'll take this into consideration.
judges: Garland, Katsas, Randolph